AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Louisiana

**SEALED**

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| ALBERT PAUL WEBER, JR. | ) | 26-MJ-36 |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___2017 through the present___ in the of parish ___Orleans___ in the

___Eastern___ District of ___Louisiana___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1028A | Aggravated identity theft |
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1349 | Wire Fraud conspiracy |
| 18 U.S.C. § 1512(a)(2) | Threatening a witness |
| 18 U.S.C. § 1956(a)(1)(B)(1) | Money laundering - concealment |
| 18 U.S.C. § 1956(h) | Money laundering conspiracy |

This criminal complaint is based on these facts:

See attachment.

☑ Continued on the attached sheet.

/s/Emily Keller
_____
*Complainant's signature*

FBI, Special Agent Emily Keller
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___3/26/26___

_____
*Judge's signature*

City and state: ___New Orleans, Louisiana___

Hon. Michael B. North, U.S. Magistrate Judge
_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 26-mj-36** |
| **v.** | * | **SECTION:  MAG** |
| **ALBERT PAUL WEBER, JR.** | * | |

*        *        *

## AFFIDAVIT IN SUPPORT OF
## ARREST WARRANT AND A CRIMINAL COMPLAINT

I, Emily R. Keller, being first duly sworn, hereby depose and state as follows:

### AFFIANT

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since October of 2019. My initial training consisted of an eighteen-week FBI new Agent course during which I received instruction on various aspects of federal investigations. In addition, I have earned both a Bachelor of Arts in International Studies and a Master of Public and International Affairs.

2.      Currently, I am assigned to the white-collar crime squad in the New Orleans Field Office. My duties and responsibilities include investigating complex financial crimes. Preceding my current assignment, I worked in the Charlotte Division, Greensboro Resident Agency, for three years. Prior to becoming a Special Agent of the FBI, I worked as a Staff Operations Specialist, investigative analyst, for the FBI for over four years.

3.      In my capacity as a Special Agent, I have been involved with numerous investigations related to financial crimes and other violations of Title 18 of the United States Code. I am familiar with, and have employed, investigative techniques used in these investigations. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws,

including Title 18, United States Code, Sections 875, 1028A, 1343, 1349, 1512(a)(2), 1956(a)(1)(B)(1), and 1956(h).

## I.    PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint and arrest warrant for Albert Paul WEBER, Jr. ("WEBER" or the "SUBJECT PERSON"), date of birth May 19, 1983, resident of Harvey, Louisiana, for violations of **18 U.S.C § 875 (interstate transmission of threat), 18 U.S.C § 1028A (aggravated identity theft), 18 U.S.C § 1343 (wire fraud), 18 U.S.C § 1349 (conspiracy to commit wire fraud), 18 U.S.C § 1512(a)(2) (threatening a witness), 18 U.S.C § 1956(a)(1)(B)(1) (money laundering concealment), and 18 U.S.C § 1956(h) (money laundering conspiracy)**. The statements in this affidavit are based on my personal knowledge, as well as information I have received from other persons with knowledge of the relevant facts. Since this affidavit is being submitted for the limited purpose of supporting a criminal complaint. I have not included each and every fact known to me concerning this investigation.

## II.    FACTUAL SUMMARY

5.    Since June 2023, the FBI has been conducting an investigation regarding a loan fraud scheme facilitated by WEBER and his business, A. Weber Music & Sports Entertainment, LLC ("Weber Music & Sports"), as well as ███████████████████ ████████████████████████████████████ and other known and unknown co-conspirators.

6.    From March 30, 2021, through March 25, 2025, over $3.5 million has been disbursed by at least five lenders at the request of WEBER, purporting to be for athletes interested in securing "bridge loans," a loan for the purpose of covering an athlete's training and life expenses between the end of their college career and a professional sports draft. Disbursements of these

2

loans were transferred to accounts held by ▮ and others associated with the scheme. Subsequently, a portion of these funds was provided to WEBER.

7.    FBI New Orleans initiated this investigation into WEBER and ▮ after a complainant alleged loans, he believed he was providing to an athlete were actually provided to individuals impersonating the athlete. In January 2022, an ▮ personal lender alleged that during 2021 he was personally defrauded of more than $900,000 in a private money investment/loan scheme that was supposed to benefit then-National Basketball Association ("NBA") draft prospect, ▮.

8.    Through the course of the FBI's investigation, information provided by lenders, financial record analysis, and investigative activity conducted by the Jefferson Parish Sheriff's Office revealed there is probable cause WEBER and Lash operated a loan fraud scheme.

9.    WEBER and ▮ defrauded underwriters and lenders by impersonating professional athletes and their family members to obtain fraudulent loans on behalf of the athletes. Using fraudulent identification, numerous telephone numbers, and fictitious misleading email addresses, WEBER and ▮ and their co-conspirators, both known and unknown, posed as well-known basketball and football athletes and deceived individuals and companies into providing them with millions of dollars. These funds were transferred to accounts controlled by ▮ and their co-conspirators. A portion of the funds were eventually transferred to WEBER. WEBER and ▮ used funds from the fraud scheme for personal expenditures, such as shopping, dining, and travel.

---

[1] ▮ currently is a professional basketball player for the NBA ▮. In 2021, ▮ was the ▮ pick in the NBA draft, selected by the ▮. In 2021, ▮ signed a ▮ contract worth ▮ million with the ▮.

10.    The FBI reviewed personal and business financial accounts WEBER, ███, and their co-conspirators used to receive victim lender payments. The receipt of loan disbursements from victim lenders into voluminous financial accounts appeared to be designed to mislead and deceive victim lenders, conceal the source and location of the funds, and conceal WEBER's identity. ███ and other co-conspirators often transferred loan funds to different accounts and made cash withdrawals shortly after receipt of these funds from victim lenders.

11.    Below are examples of individual victim lenders who were defrauded by WEBER and ███, including historical instances that match many aspects of the ongoing schemes. In addition to the 2011 and 2017 investigations involving WEBER's athlete-related fraud, WEBER has victimized three new victim lenders (Victim Lenders 1, 2, and 3, below) in an athlete impersonation scheme and two victim sports agents (Victims 4 and 5 below) in a fake athlete trip scheme.

### A. Historical Pattern of Similar Fraudulent Activity by WEBER

12.    According to previous FBI and JPSO investigations, WEBER was involved in similar loan fraud schemes in 2011 and 2017.

#### 1)    2011 JPSO Investigation into WEBER's Athlete Fraud

13.    On July 6, 2011, JPSO arrested WEBER for violations of felony theft and extortion. WEBER provided detectives a recorded statement in which he acknowledged he received funds from a sports agency, based in ███████, Texas, for the recruitment of the athlete whom WEBER never contacted or met.  However, JPSO dismissed the charges due to lack of victim cooperation.

*2)*   *WEBER's Leonard Fournette Scheme*

14.   From May 2017 through September 2020, FBI New Orleans investigated allegations made by a victim lender, a resident of ▮▮▮▮▮▮ Florida, who provided funds he believed were being disbursed to ▮▮▮▮▮▮ at the direction of an individual named ▮▮▮▮▮▮ the athlete's mentor. At the time, ▮▮▮ was a football player at ▮▮▮▮▮▮ who was soon to be drafted to the NFL.

15.   The lender traveled to New Orleans and met with an individual he believed was ▮▮▮▮▮▮, and another co-conspirator. ▮▮▮ told the victim lender that the first loan was for ▮▮▮ to buy out his contract with his sports agent. The second loan was to pay off individuals he described as "street guys" who had loaned ▮▮▮ money during his years as a student at ▮▮▮▮▮▮. Later, the fake ▮▮▮ requested more money which he promised to pay back with a signing bonus from ▮▮▮▮▮.

16.   During an FBI interview of the actual ▮▮▮▮▮▮, ▮▮▮ advised he did not know ▮▮. ▮▮▮ did not know the lender who reported the activity to the FBI, did not receive any loans from this lender; and did not know the owners of the bank accounts that received the loan disbursements from the lender.

17.   The victim lender sent several transfers to three accounts not in ▮▮▮ name. One of the account owners was ▮▮▮▮▮▮, a resident of Marrero, Louisiana. During an FBI interview of ▮▮▮, she admitted receiving a series of wire transfers in her bank accounts between December 2016 and January 2017. Following receipt of the wire transfers, she took the cash from her accounts and gave it to WEBER. WEBER allowed ▮▮▮ to keep a small portion for herself. WEBER insisted she retrieve the cash and deliver it to him as soon as the funds were available in the accounts.

**B. Victim Lender 1 &** ███████████

18.     Victim Lender 1, a resident of ███████████ , told the FBI that someone impersonating ███████████ and his father, ███████████ , defrauded him and other investors. The scheme involved bridge loans that the investors believed would be used to cover ███████████ training and life expenses between the end of his NCAA playing eligibility and the 2021 NBA draft. The loans were to be repaid once he received an NBA contract and was paid upon the start of the 2021 season.

19.     The fake ███████████ directed Victim Lender 1 to wire loan funds to multiple third-party individuals, mostly located in the New Orleans area. Eventually, Victim Lender 1 learned that the individuals he communicated with were not the real ███████████ .

20.     As detailed below, between March 30, 2021, and July 1, 2021, Victim Lender 1 made 15 wire transfers totaling $850,000 from his ███████████ accounts to bank accounts held by ███████████ , and other co-conspirators.

*3)     $25,000 Loan*

21.     In March 2021, Victim Lender 1 learned from his friend, a resident of ███████████ that ███████████ was trying to secure a bridge loan for his son, ███████████ , who was going to be a top pick in the upcoming NBA draft. Victim Lender 1's friend owns a business through which he mentors both college and professional athletes and provides bridge loans.

22.     Victim Lender 1 and his friend had some three-way phone calls with fake ███████████ during which Victim Lender 1 and his friend attempted to vet ███████████ .

23.     On March 16, 2021, email address ███████████ sent an email to Victim Investor 1's friend with the legitimate date of birth and social security account number

6

for ███████████. Email account ██████████████████████ was created several hours before this email was sent.

24.    The next day, email address ██████████████████████ sent an email to Victim Lender 1's friend with ████████████ driver's license number and address. The provided address was in ████████, Texas, a suburb of █████. On April 3, 2021, Victim Lender 1 was in ██████. He told fake ███████████████ he wanted to meet with him in person. Fake ████████ ███████████ claimed his wife had COVID, so he was in quarantine and could not meet.

25.    Victim Lender 1 drove by the address located in ████████, Texas. Victim Lender 1 collected information from a vehicle in the driveway of the residence and confirmed it belonged to █████████████.

26.    On March 30, 2021, Victim Lender 1 made a wire transfer of $25,000 from his ████████████████ account to a █████████████ account held by ████████████, a co-conspirator of WEBER and ████.

    *4)    $300,000 Loan*

27.    Shortly thereafter, Victim Lender 1 received a phone call from someone purporting to be ████████████. Fake ███████████ claimed he started gambling in college and owed a bookie $300,000. He claimed he was receiving threats of physical injury and was desperate to get the bookie paid off.

28.    Fake ████████████ requested Victim Lender 1 wire funds to his "friends," claiming concerns the NCAA might investigate ████████████ gambling activity if the provided loan was sent directly to █████ or █████████████.

29.    Between March 31, 2021, and April 30, 2021, Victim Lender 1 made seven wire transfers, totaling $325,000, to █████████████████ account.

> 5)    *$200,000 Loan*

30.    Next, fake ▮▮▮▮▮▮▮▮▮▮ asked Victim Lender 1 for additional loans, claiming he would terminate ▮▮▮▮▮▮▮▮▮▮ current agency relationship with ▮▮▮▮▮▮ and have Victim Lender 1 represent him instead.  Victim Lender 1 was previously a certified NFL Player Agent.

31.    After signing an agreement to represent ▮▮▮▮▮▮▮▮▮▮, Victim Lender 1 made subsequent loans based on a fraudulent email purporting to be from ▮▮▮▮▮▮, advising they would no longer represent ▮▮▮▮▮ upon receipt of funds to buy out ▮▮▮▮▮▮s contract and reimburse them for advanced training expenses.

32.    On June 7, 2021, Victim Lender 1 sent the following email to ▮▮▮▮▮▮▮▮▮▮▮▮ referencing an additional request for $200,000 to buy out ▮▮▮▮▮s contract with ▮▮▮▮▮▮:



Email account ███████████████████ was created four days prior to the receipt of the above email, on June 3, 2021. The IP address used to create that account was in New Orleans.

33.    On June 8, 2021, email address █████████████████ sent the following email to Victim Lender 1, with fake ██████████ "written proposal."



Email account ███████████████████ was created one day prior to the date the above email was sent, on June 7, 2021.

34.    On June 9, 2021, fake ████████████ signed an agreement confirming he owed Victim Lender 1 $750,000 based on prior loans provided to him by Victim Lender 1 and was requesting $200,000 to repay █████████ for funds advanced for ██████████'s benefit. Fake ███████████ agreed to pay the $200,000 directly to ████████. Within 7 days of being provided the $200,000 loan, ████████ agreed to pay Victim Lender 1 for the previously provided loans.

9

35.    This agreement was notarized in Orleans Parish. In an email sent to Victim Lender 1 on June 9, 2021, fake ██████████ provided the tracking number for the agreement that he mailed to Victim Lender 1.

36.    On June 10, 2021, Victim Lender 1 made two $50,000 wire transfers, totaling $100,000, from his ██████████ account to ██████████ account and ██████ ████████████████████ account. ██████ is a co-conspirator of WEBER and ███.

37.    On June 11, 2021, Victim Lender 1 made one wire transfer in the amount of $50,000 from his ██████████ account to ██████████████ account. Following this transfer, ██████ withdrew $45,000 in cash from this account.

38.    On the same date, Victim Lender 1 made one wire transfer in the amount of $50,000 from his ██████████ account to ████████████████████████ account, ██████ is a co-conspirator of WEBER and ██████

*6)    $300,000 Loan*

39.    On June 24, 2021, email address ████████████████████ sent the following email to Victim Lender 1, referencing a request for an additional loan in the amount of $300,000.



10

40.     On June 24, 2021, Victim Lender 1 sent the following email response to email address ████████████████████████████████████████ requesting proof that ███████ had been reimbursed in its entirety and that ██████████ owed no one else money.



41.     On July 1, 2021, Victim Lender 1 received the following email from email address ██████████████████████ claiming to be affiliated with ████████ and agreeing to release ███████ from his contract with ██████████.

11



Email account ▮▮▮▮▮▮▮▮▮▮▮▮ was created on June 24, 2021, one week before the above email was sent to Victim Lender 1.

42.    On July 1, 2021, Victim Lender 1 made three $100,000 wire transfers, totaling $300,000, from his ▮▮▮▮▮▮ account to ▮▮▮▮▮▮▮ account, ▮▮▮ ▮▮▮▮ account, and ▮▮▮▮▮▮▮ account. From these funds, between July 2 and July 8, 2021, three separate cash withdrawals, each $30,000, were made from ▮▮▮▮▮ ▮▮▮▮ account.  From these funds, in July 2021, ▮▮ made two transfers to WEBER's CashApp[2] account, totaling $4,000, and four cash withdrawals, totaling $84,000, from ▮▮ Chase Bank account.

---

[2] CashApp is a mobile application for peer-to-peer money transfers and payments.

12

43. On July 15, 2021, Victim Lender 1 sent an email to email addresses ▬▬▬▬▬▬▬▬▬▬▬▬ and ▬▬▬▬▬▬▬▬▬▬▬▬ stating: "You guys need to wire me at least $50,000 of the $1,050,000 you owe me by no later than noon tomorrow, July 16, 2021…That money was supposed to be paid in full by no later than July 6, 2021 which you failed to pay." He further explained, "When you sign Promissory Notes and Contracts that have specific due dates, that is when payments have to be made."

44. Victim Lender 1 advised FBI Agents that he encouraged ▬▬▬▬▬▬ and ▬▬▬▬▬ to apply for a line of credit from a different lender so they could pay back Victim Lender 1 for loans he made on their behalf.

45. On July 26, 2021, fake ▬▬▬▬▬▬ provided Victim Lender 1 the following line of credit letter on ▬▬▬▬ Bank's letterhead, whereby ▬▬▬ Bank confirmed ▬▬▬▬ would be provided a $20 million line of credit by August 2, 2021.

13



46. On July 27, 2021, Victim Lender 1 sent an email to email addresses ███████████████ and ██████████████████ through which he informed them the line of credit letter was not a standard line of credit letter.

47. In the below text messages on June 28, 2021 between Victim Lender 1 and fake ███████████, using telephone number ██████████, fake ██████████ assured Victim Lender 1 he would pay back the loans. Telephone number ██████████ is the same telephone recorded with Google as the recovery telephone number for email address ██████████████████

14

Text message sent from Victim Lender 1:



Text message sent from fake ███████████████ :

7)    *Additional Attempted Loan*

48.    On August 25, 2021, Victim Lender 1 sent an email to accounts ████████████████████ and ███████████████████████ confirming their request for an additional loan of $1 million so ██████████ could pay off █████████. In exchange for the loan, they would pay back the existing delinquent loan and interest that was to be paid back no later than July 22, 2021 as well as an additional $1 million on the new loan. Based on the fact they were delinquent on their previous loan, Victim Lender 1 advised that new investors required several criteria to be met before providing an additional loan of $1 million. Some of the requirements included:

a.    ████████████████ signing an affidavit in front of a notary public showing there was no additional debt owed by him to anybody or disclose if there was additional debt; and

b.    All documents were to be executed by ██████████████ in the presence of the investors and/or Victim Lender 1 and a notary public.

49.    On October 5, 2021, Victim Lender 1 sent an email to address ███████████████████████ with two affidavits and a promissory note. Victim Lender 1

16

requested ▮▮▮▮▮▮▮▮▮ sign all three documents in front of a notary public and ship them back via next day air to him. A forged signature of ▮▮▮▮▮▮▮ s name was on these documents. The documents were notarized in Jefferson Parish.

50.     The fake ▮▮▮▮▮▮▮▮ mailed documents to Victim Lender 1 via the United Parcel Service ("UPS"). The mailing label, dated October 11, 2021, had a return address of 1516 Harvey Boulevard, Harvey, Louisiana 70058. Based on online searches, the address does not appear to exist.

51.     On October 11, 2021, email address ▮▮▮▮▮▮▮▮▮▮▮▮ sent Victim Lender 1 two emails. One contained an image of a Texas driver's license purportedly belonging to ▮▮▮▮▮▮▮▮, and one contained an image of a Texas driver's license purportedly belonging to ▮▮▮▮▮▮▮. The information on the licenses was accurate, but the photos on the licenses appeared to have been obtained from the Internet. Email account ▮▮▮▮▮▮▮▮▮▮▮ was created 12 days before the driver's license photos were sent to Victim Lender 1, on September 29, 2021.

52.     Victim Investor 1 advised FBI Agents that ▮▮▮▮▮▮▮ switched his telephone number and email address several times, claiming other NBA agents were repeatedly contacting him. After the receipt of the fraudulent licenses, Victim Lender 1 did not loan the fake ▮▮▮▮▮▮ any more funds.

53.     After one of the wire transfers Victim Lender 1 made to ▮▮ for disbursement of ▮▮▮▮▮ loan, Victim Lender 1 called ▮▮ via her telephone number ▮▮▮▮▮▮ The purpose of his call was to confirm ▮▮ was a friend of ▮▮▮▮▮'s. ▮▮ spoke with him. After realizing the loans to the ▮▮▮▮▮ were part of a scam, Victim Lender 1 contacted ▮▮ via his telephone number ▮▮▮▮▮. Victim Lender 1 spoke with ▮▮, who claimed he was

17

allowed to keep some of the money Victim Lender 1 sent him. He turned the rest of the cash over to someone he referred to as "Mr. Black."

54.    Victim Lender 1 never received repayment for the loans he provided to the fake ██████████.

### C.  Victim Lender 2 & ████████████

#### 1)    $1.8 Million Loan

55.    During an FBI interview of Victim Lender 2, who ran a business located in Boston that offers loans to professional athletes, Victim Lender 2 claimed an unidentified male portraying himself as ████████████ was introduced to Victim Lender 2 by way of referral from someone in the sports industry.

56.    On June 8, 2023, and August 17, 2023, the fake ████████ electronically signed loan paperwork utilizing email address ████████████. Email account ████████████ was created on April 25, 2023.

57.    The fake ████████ also signed a "Player Risk Transfer Agreement," entered into as of June 9, 2023, whereby ████████ agreed to allow Victim Lender 2 to acquire an interest in his future basketball compensation.

58.    While applying for the loans, the fake ████████ provided Victim Lender 2 a W-9 Form, dated March 18, 2023, including his name, address, social security number, and signature, as well as a copy of his ████████ driver's license.

---

[3] ████████ currently is a professional basketball player for the NBA's ████████. In 2023, ████████ was the ████ overall pick in the NBA draft, selected by the ████████. In 2023, ████████ signed a ████████ contract worth ████ million with the ████████. In ████, the ████ acquired ████████.

59.     On June 9, 2023, $750,000 was transferred via wire from Victim Lender 2's ▌ ▌ account to a ▌ brokerage account held in ▌'s name. Three days later $350,000 was transferred via wire from ▌'s ▌ account to ▌ account. Between June 12, 2023, and July 11, 2023, three transfers totaling $310,000 were made from ▌ account to WEBER's Capital One Bank account.

60.     On August 18, 2023, $1,085,000 was transferred via wire from Victim Lender 2's ▌ account to ▌'s ▌ brokerage account. Four days later, on August 22, 2023, $430,000 was transferred from ▌'s ▌ account to ▌ ▌ account, which ▌ opened weeks earlier, on August 1, 2023.

61.     Victim Lender 2 advised FBI Agents that he became concerned with the deal after ▌ did not follow-up on the servicing agreement. Eventually, fake ▌ ceased communications with Victim Lender 2.

*2)     FBI Interview of* ▌

62.     During an FBI interview of real ▌, ▌ advised Agents that his high school coach was approached by an individual who identified himself as Chris Smitch ("Smitch"). Smitch claimed to be a reporter for Sports Illustrated and wanted to do an article on ▌. Around July or August 2022, ▌ was in school at ▌. Smitch told ▌ that he was going to drive to ▌ from ▌ to give ▌ cash. Smitch stated the cash would be for ▌ joining a "company." ▌ did not physically meet with Smitch.

63.     Smitch set up a Zoom meeting with the "company." The meeting involved Smitch, two unidentified black males, and a white male. ▌ did not see Smitch's face because he pointed his camera towards the ceiling. One of the unidentified black males in the meeting's name

was "Albert." FBI Agents showed ▮▮▮▮▮ two unlabeled photos of WEBER. ▮▮▮▮▮ believed one of the black males in the meeting looked like WEBER.

64. ▮▮▮▮▮ sent Smitch a photo of his driver's license via text message. ▮▮▮▮▮ may have told Smitch his social security number. ▮▮▮▮▮ never signed documents or received any money. He did not use email address ▮▮▮▮▮▮▮▮.

### 3) *IP Address Analysis*

65. According to records obtained from DocuSign,[4] on February 16, 2023, ▮▮▮ used IP address 98.164.119.56 to electronically sign a document titled "▮▮▮▮ Lease Agreement Addendum to sign, pdf." On March 29, 2023, using the same IP address, 98.164.119.56, "▮▮▮▮ ▮▮▮▮" electronically signed a document titled "▮▮▮▮.pdf," originated by an entity in ▮▮▮▮, New Jersey. The signature was captured on a mobile device. On the same day, ▮▮▮ received a wire transfer of $75,000 into her ▮▮▮ account from the entity that originated the DocuSign document.

66. According to records obtained from CashApp, on April 22, 2023, WEBER's CashApp account was accessed with an iPhone utilizing IP address 172.59.104.100. On May 16, 2023, "▮▮▮▮," used the same IP address, 172.59.104.100, to electronically sign a document titled "Client Relationship Summary | ▮▮▮▮" through DocuSign. The signature was captured on a mobile device. The document originated by an entity in ▮▮▮▮, California.

---

[4] DocuSign is an electronic signature and digital transaction management platform that allows users to sign, send, and manage documents online.

### D. Victim Lender 3 & ██████████

67.    On May 15, 2025, the Jefferson Parish Sheriff's Office's ("JPSO") Economic Crimes Section was contacted by Victim Lender 3, who ran a business located in ██████, California that provides personal loans. Victim Lender 3 reported an individual purported to be NFL athlete ██████████,[5] contacted Victim Lender 3 and requested multiple loans. The loans were provided after two residences were utilized as collateral.

68.    On February 24, 2025, Victim Lender 3 disbursed a $150,000 loan through wire transfer to ██████████████ account.

69.    Victim Lender 3 told JPSO that someone purporting to be ██████ father, ██████, met with a notary, ████████████, in Jefferson Parish on two separate occasions, on March 5 and March 16, 2025, for the purpose of signing documents related to the loans. On March 5, 2025, the black male purporting to be ██████████ forged ██████████ signature on a Deed of Trust ("DOT") for ████████ property located in ████████, Texas. The black male provided the DOT to ██████, and she notarized the document.

70.    On March 16, 2025, the black male purporting to be ██████████ met with ████████ once again and provided a second DOT for ██████████ property in ████████. He also forged ████████████ signature on the document. The document was notarized by ██████.

71.    On March 25, 2025, Victim Lender 3 disbursed a $100,000 loan through wire transfer from their ██████████ account to ██████████████ account.

---

[5] ██████████ currently is a professional football player for the NFL's ██████████. In 2025, ██████ was drafted by the ██████████ overall in the NFL draft. In 2023, ██████ signed a ██████ contract worth ██████ million with the ██████, which included a ██████ million signing bonus.

72.     Of the funds sent by Victim Lender 3, in March 2026, a ▮▮▮▮▮▮ account controlled by WEBER's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, received three transfers, totaling $15,000, from ▮▮▮▮▮▮▮▮ account.

73.     After receiving the first two loans, the suspect requested a third loan in the amount of $200,000 from Victim Lender 3, in May 2025.

74.     On May 13, 2025, the same notary, ▮▮▮▮, met with a male who claimed he was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and provided ▮▮▮▮▮ identification. ▮▮▮▮▮ was accompanied by a female, who identified as ▮▮▮▮▮▮▮▮▮▮▮. Both ▮▮▮▮ and ▮▮▮▮▮ endorsed loan documents with their signatures. The notary recognized ▮▮▮▮ as the same individual who identified as ▮▮▮▮ during their previous meetings. The notary left the location and immediately notified Victim Lender 3 of possible fraudulent activity. Victim Lender 3 contacted law enforcement, and JPSO Investigators ultimately determined the ▮▮▮ and ▮▮▮▮▮ information was used to obtain the fraudulent loans.

### 1)    JPSO Interview of Notary

75.     During an JPSO interview of the notary, ▮▮▮▮, she described how she previously met the same black male on two separate occasions. On March 5, 2025, they met at Nobuko located at 1901 Manhattan Boulevard, Harvey, Louisiana 70058. On March 16, 2025, they met at the Raising Canes located at 1735 Manhattan Boulevard, Harvey, Louisiana 70058. At each meeting the black male identified himself as ▮▮▮▮▮. ▮▮▮▮ believed, based on the photo identification provided by the suspect, that she was in fact speaking with ▮▮▮▮▮.

76.     On May 13, 2025, ▮▮▮▮ met with the same black male a third time at his residence located at ▮▮▮▮▮▮▮, where she observed a white SUV parked in the

22

garage. Plauche stated the same black male from the previous March 5 and March 16 meetings, who she knew as ████████, identified himself as ████████ and was accompanied by a black female, who identified herself as ████████.

      *2)     JPSO Arrest of Weber and ███*

77.    JPSO Investigators organized a meeting between ████ and the individuals purporting to be the ████████, to sign additional documents to process the third loan. On May 16, 2025, Investigators set up surveillance at the meeting location, Raising Canes located at 1735 Manhattan Boulevard. Shortly thereafter, WEBER arrived in a white 2018 Bentley Bentayga, and ████ arrived in a gray 2016 Mazda CX-9. JPSO Investigators arrested WEBER and ████ for violations of bank fraud, theft of $250,000, and forgery.

78.    At the time of their arrests, WEBER and ████ were each in possession of an Apple iPhone. JPSO seized both cell phones. FBI later seized and searched both cell phones pursuant to search warrant 25-mc-2241, signed by the Honorable Magistrate Judge Eva Dossier on November 13, 2025.

      *3)     WEBER Confessions to ████ Scheme*

79.    During a recorded JPSO interview of WEBER, WEBER confessed to using ████ ████ and ████████s information without their permission to obtain fraudulent loans for his personal benefit. WEBER admitted he persuaded ████ to use her bank account on the loan documents to receive the funds. WEBER also admitted to meeting ████ on multiple occasions at several different locations in Jefferson Parish. WEBER also made several false statements to JPSO Investigators.



80.     WEBER, who described himself as a sports consultant, advised that last year ████████, WEBER's longtime friend, introduced WEBER to ████████, who works in finance. Both ██████ and ████████ reside in Florida.

81.     WEBER claimed that one year ago, he received a $1 million loan for ████. The money was sent to ██████ and ████████, after they opened an account for ████. Instead of taking a commission from the funds, they took the money and disbursed it to someone else. WEBER claimed that ██████ gave him around $10,000 or $15,000 through CashApp and sent money to ███, then ████████ stopped communicating with WEBER. WEBER falsely claimed ████████ received some of the funds from this loan.

82.     WEBER advised he was trying to recruit ████. He was talking with ████'s parents, ████████████. Later in the interview, WEBER admitted to calling ████████ several times. WEBER claimed he changed his phone number often because he wanted to get in with ████████. When he called, WEBER did not want to use his name, because ████████ would say he did not want his services.

83.     WEBER admitted he was trying to get a loan from Victim Lender 3 while purporting to be ████████. WEBER pretended to be ████████ when he met with the notary and presented ████████ identification. WEBER admitted that he did not have permission to request a loan on behalf of ████████ or ████. He admitted the loan he took out on ████████'s behalf with Victim Lender 3 was to benefit WEBER at the present time. He planned to get the business from the lender, pay back the previous loan from the year prior, and then tell the ████ family the truth and connect them with Victim Lender 3.

84.     WEBER first met with the notary a couple months ago to secure the first loan he applied for from Victim Lender 3 for ████████. He used real ████████ house as

24

collateral and fake identification with ██████████ information. The lender deposited maybe $100,000 into ███'s account. The funds from this loan were gone.

85.    WEBER planned to meet the same notary at Raising Canes to sign a paper. He used ██████████'s name as the applicant for the loan and ██████████'s house as collateral. WEBER planned to tell ████████ he found another way to get a loan. When he met with the notary, he pretended to be ████████. A picture of WEBER's face was on ████████'s Florida identification. When he signed the loan papers, he signed ████████'s name.

86.    WEBER advised JPSO Investigators that he was going to pay back the loan to Victim Lender 3 with funds from other deals with other people who would be "legit."

87.    WEBER admitted he made a mistake: "100% of the story. I fucked up. I made up. It was a good intention play but the way I went about it, it didn't look good. I'm not here to lie to you, I don't want to lie. I don't want to go to jail."

88.    WEBER described ████ as his "girlfriend" and "baby mama." He uses her bank account.

89.    WEBER claimed he tried to make an honest living and said this is the first time he has ever done this.

4)    *JPSO Interview of* ████

90.    During a JPSO interview of ████, she confessed to creating a fraudulent identification for the purpose of meeting with the notary; admitted to allowing WEBER to use her bank account to receive funds; and provided several false statements to JPSO Investigators.

91.    Since 2019, ███ has owned an online clothing boutique, ██████. Throughout the interview, ███ referred to WEBER as Chris Jones ("Jones").[6] She claimed she met Jones, whom she is dating, through a dating app. She said she has known him for over a year. JPSO Investigators showed ███ a picture of WEBER, whom she identified as Jones.

92.    ███ claimed that at Jones's direction, she allowed Jones to use her ██████ bank account at ████████. She remembered receiving two deposits into her account, totaling over $200,000. From these funds, Jones let her keep $5,000 to $10,000. She withdrew maybe $100,000 in cash and gave it to WEBER in an envelope.

93.    ███ advised that this money is no longer in her bank account. She explained that the money was not hers. She was just doing Jones a favor because Jones allegedly did not have a bank account.

94.    ███ falsely told JPSO Investigators that she has never been to WEBER's house.[7] Instead, they went to Harrah's a lot together, since he liked to gamble. She stated that he drove a white Bentley.

95.    ███ admitted to signing ████████ name on paperwork, on May 13, 2025. She advised that she paid someone on the Internet to create an identification for ████████.

_____

[6] In several different parts of WEBER's scheme, he has used an alias beginning with "Chris." For example, WEBER pretended to be "Chris Smitch" in the ██████ part of the fraud described above in Part III(C), and WEBER pretended to be "Chris Robert" in a more recent portion of his athlete scheme, described below in Part III(E).

[7]    Not only did WEBER admit that they were romantically involved, but ███ previously described WEBER as her boyfriend during a domestic disturbance. On October 3, 2016, JPSO Officers were dispatched to ████████████████ Kenner, Louisiana 70065 in reference to a disturbance. Officers arrived on scene and spoke with ███, who advised that she found her boyfriend, WEBER, with another woman, and a verbal altercation ensued.

Moreover, on May 16, 2025, JPSO executed a search warrant at WEBER's residence, ███ Hyde Park Avenue. Prescription medication for ███ was found in WEBER's residence as well as a T-Mobile envelope addressed to ███ at ███ Hyde Park Avenue.

She exclaimed, "I hate that I fucking did this." She explained Jones told her she needed to sign the documents to release the money.  She acknowledged that it did not feel right.

96.    During ███'s interview, JPSO Investigators asked ███ permission to enter her passcode into her cell phone. She agreed and provided her passcode. When JPSO Investigators reviewed her contacts in her cell phone, WEBER's cell phone number was identified as being saved as "partner in crime." ███ stated, "that looks bad." She claimed her daughter saved Jones's phone number under that name in her cell phone.

*5)    JPSO Search of Vehicles*

97.    On May 16, 2025, JPSO executed a search warrant of the white 2018 Bentley Bentayga. Investigators identified the Louisiana Registration for the vehicle belonging to WEBER. JPSO seized the vehicle, and FBI later seized pursuant to search warrant 25-mc-1429, signed by the Honorable Magistrate Judge Eva Dossier on July 14, 2025.

98.    On May 16, 2025, JPSO executed a search warrant of ███'s vehicle, a gray 2016 Mazda CX-9. Investigators seized glue/spray adhesive and laminate paper with images of a fraudulent Florida driver's license containing ████████ and ████████ information, but with photographs of ███ and WEBER.

*6)    Bond/Release Paperwork*

99.    After WEBER and ███ were arrested, they were released on bond in Jefferson Parish. WEBER signed a bond on July 14, 2025, and ███ signed a bond on July 15, 2025.

100.    The appearance bond for both WEBER and ███ included the following sworn statement: "As a condition of bond, you are ordered to refrain from the violation of any federal, state, parish, or local laws…. Noncompliance with this order may result in your being found in contempt of court, punishable by up to 6 months in parish prison."

27

### E. Federal Civil Complaint Exposing WEBER's Scheme

101.    As detailed above in paragraph 97, JPSO seized WEBER's Bentley, and FBI later took possession of the Bentley from JPSO on July 14, 2025, pursuant to a court-ordered seizure warrant. On September 16, 2025, WEBER contacted FBI to inquire about submitting a claim for the returns of the Bentley. On September 27, 2025, WEBER submitted a claim under the Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, but WEBER did not sign it under penalty of perjury. On October 14, 2025, WEBER submitted an amended and signed claim for the Bentley.

102.    On January 12, 2026, the government filed a complaint for *in rem* forfeiture of the Bentley. *See United States v. 2018 Bentley Bentayga, VIN SJAAC2ZVXJC018187*, 26-cv-72"I," Dkt. No. 1 (E.D.La. Jan. 12, 2026). The complaint named WEBER and ▮ and described the FBI investigation into WEBER's athlete impersonation scheme. *See id.* at 3-8. The complaint sought forfeiture of the Bentley because it was purchased with the proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1956. *Id.* at 8-9. The Court granted the government's motion to stay that civil action. *Id.*, Dkt. #9.

### F. New Crimes While on Bond from Jefferson Parish

103.    WEBER has continued to run new versions of impersonation schemes involving athletes, continuing after he was arrested by JPSO in May of 2025 and released on bond. This conduct continued even after WEBER started contacting FBI in September of 2025 after WEBER learned that FBI had seized his Bentley based on its connection to federal crimes.

#### 1)    Fake ▮ Trip Scheme

104.    On March 20, 2026, Affiant learned of a complaint filed with the FBI by an ▮ based sports agent ("Victim 4"), involving WEBER, and Affiant interviewed Victim 4. Victim 4 helps basketball players travel to foreign countries to play basketball games, including in a

██████ league during the NBA offseason, so that aspiring and professional basketball players can gain exposure to teams and coaches from multiple professional leagues. In July 2025, a college coach introduced him to "Chris Robert," whom Victim 4 later learned was WEBER.

105.    WEBER, posing as "Chris Robert," told Victim 4 that he trained basketball players and asked Victim 4 to help him organize a trip for basketball players to ████ in September 2025. Victim 4 agreed to handle the travel logistics related to this trip, if WEBER managed athlete recruitment.

106.    An associate of Victim 4, a █████████ sports agent ("Victim 5"), sent funds to one of WEBER's associates on behalf of his athlete clients for "Chris Robert's" trip.

107.    On March 23, 2026, Victim 5 told FBI that between August and November 2025 he sent approximately $45,000 to cover the fees for five of his basketball athlete clients to participate in the trip with "Chris Robert." At the direction of "Chris Robert," Victim 5 sent approximately $42,000 to █████████ through CashApp and about $3,000 to █████████ (WEBER's ████████ coconspirator) through Apple Pay. Originally, the trip was planned for September 2025, then it was moved to October 2025, and then moved again to late December 2025 or early January 2026. Victim 5 later learned from Victim 4 that the trip had never been planned.

108.    Victim 4 advised the FBI that "Chris Robert" said he would refund the payments he received on behalf of athletes but kept pushing back his payback date. At one point, "Chris Robert" said someone named "Paul in the streets" could deliver approximately $40,000 to $50,000 in cash to Victim 4 to pay back the athletes' funds.

109.    Victim 4 sent text messages to █████████, but she never responded. However, after Victim 4 messaged █████████, "Chris Robert" called immediately and asked Victim 4 to stop calling ████.

29

110.    Victim 4 advised the FBI that a Houston-based athlete, who had a prior relationship with Victim 4, advised Victim 4 that WEBER, purporting to be "Chris Robert," used a Gmail account containing Victim 4's name. The Houston athlete told Victim 4 that he also sent funds to ▮▮▮▮▮▮▮▮, after "Chris Robert" sent the Houston athlete a contract to play for a professional team in ▮▮▮▮▮. The Houston athlete later realized the contract was fraudulent. Previously, the Houston athlete and his father spoke on the phone with "Chris Robert," and the father, who is from the same area in Louisiana as WEBER, recognized personal information "Chris Robert" provided about himself. The Houston athlete's father determined "Chris Robert" was in fact, WEBER.

111.    In October 2025, Victim 4 learned from a Florida-based athlete that "Chris Robert" was adding additional charges to the overseas trip, charges Victim 4 had not approved or discussed with "Chris Robert." In response, Victim 4 called "Chris Robert" and told him that adding extra fees to the trip was fraud and he planned to report "Chris Robert" to police and cooperate with a law enforcement investigation against "Chris Robert." Later in the month, Victim 4 had another conversation with "Chris Robert." He told "Chris Robert" that he would report "Chris Robert's" activity to law enforcement since "Chris Robert" violated federal laws.

*2)    Threats to Victims / Witnesses*

112.    On March 23, 2026, Victim 4 sent the FBI the following voice calls he recorded with WEBER, purporting to be "Chris Robert." The voice of "Chris Robert" in these recordings matches the voice of WEBER from the JPSO recorded interview.  During the course of several calls from November 2025 through March 2026, WEBER sought to convince and then threaten his victims to send WEBER more money, and WEBER also threatened physical violence to prevent the victims from telling others about WEBER's scheme.

30

113. On November 21, 2025, a three-way call took place among Victim 4, Victim 5, and WEBER, purporting to be "Chris Robert," in which WEBER sought additional funds. Victim 4 expressed concern over additional fees added to the athletes' total trip costs that "Chris Robert" did not discuss with him. Victim 4 explained he and "Chris Robert" originally agreed for "Chris Robert" to receive $1,500 for planning the trip, but "Chris Robert" asked for Victim 5 to pay him a one-time fee of $7,500 to cover the time he spent working with the athletes. After that, "Chris Robert" planned to pay the Victim 5 back and stop planning the trip. Victim 4 refused to pay "Chris Robert" $7,500 because this was not part of their initial agreement and "Chris Robert" owed Victim 5 money.

114. On December 8, 2025, a voice call took place between Victim 4 and WEBER as "Chris Robert,":[8]

    a. During this phone call, WEBER told Victim 4 that he was not arranging for any money to be paid back to Victim 5 until Victim 5 paid "Chris Robert" $7,500. During this call, WEBER, purporting to be "Chris Robert," said that he had people in Victim 5's hometown and would hurt Victim 5 if anyone contacted WEBER's co-conspirators about the scheme. WEBER then threatened both Victim 4 and Victim 5, with particular focus on Victim 5, who WEBER believed "stirred up" the trouble WEBER was facing, if WEBER did not receive an additional $7,500.

        i. "I'm telling you if somebody approach ▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮ with some fake shit once they give me a call and let me know that was going on, **I'm gonna knock [Victim 5's] head off**. I'm telling you that. **I got**

---

[8] The full voice call is not captured in the recording, which appears to only be a partial recording, which lasted over 18 minutes.

**somebody right in this town that going touch em. Do not approach them about me they don't have nothing to do with this**…I'm telling you this and you could record this, **the day somebody approaches them about some shit they don't know about, I'm gonna knock [Victim 5's] head off**. I'm telling you. **I'm gonna knock his fucking head off**."

ii. "**I'm gonna get to him if he if he approach** ▮▮▮▮ **or** ▮▮▮▮ about any of this. **I'm gonna knock [Victim 5's] head off I'm telling you in the broad daylight**. I'm telling you."

iii. "This is what is going to happen bro. You don't know me. You never seen me. I never seen you. **I'm going find both of y'all**. I'm going get to y'all. **I'm going get to [Victim 5] for sure. For him the one who stirred up this shit**. **I'm going to get to him. I'm going to get to him**. And see him and let him know how I feel about the situation the way the games y'all playing **if y'all don't feel y'all don't owe me no $7,500** for all the work I put in. Fuck both of y'all."

iv. "I don't know you. I don't know [Victim 5]. But **I'm going to get to [Victim 5]. Trust me bro. Trust me. I got gangsters right in his town. Right in his town. I'm telling you bro I'm gonna get my money one way or other**. I'm telling you bro. You're You're **You're going to be involved with this shit if I don't get my money.**"

v. "**I'm gonna get to [Victim 5] if you don't give me my fucking money. I, I've got gangsters right in his town that could touch him**."

32

vi. **"If he (referencing Victim 5) want to get on some gangster shit. I've got gangsters right there in his town that could come see him. He not going to be able to move. When I put on the dogs. I'm come and get him. I'm telling you I want my money**."

115. On or around March 4, 2026, "Chris Robert" sent the messages shown in the below screenshot of a text message thread between Victim 4, "Chris Robert," ███████████, and ██████ ██████ (Victim 4's text messages are highlighted in green), threatening Victim 5 (redacted as "V.5"):



116.    Over the course of FBI's investigation, ▮▮▮▮▮ and ▮▮▮▮▮ have been

previously identified as co-conspirators in fraud schemes perpetrated by WEBER.

*3)*

117.    Reviews of financial records related to Victim Lender 3's loan disbursements, identified ▮▮▮▮▮▮▮ as a recipient of funds obtained through fraudulent means after WEBER purported to be ▮▮▮▮.

118.    Information received by the FBI in 2014 cited similar fraudulent activity. Three complainants alleged WEBER contacted athletes and offered to assist them with travel to play sports internationally. WEBER allegedly requested and received more than $8,000 from athletes. One of the complainants alleged that he sent funds to WEBER's "assistant," ▮▮▮▮▮▮▮. WEBER did not use the money for travel purposes and failed to pay the athletes back.

*4)*  ▮▮▮▮▮▮▮

119.    Additionally, another report to FBI connected WEBER to ▮▮▮▮▮▮▮, who was also involved in WEBER's recent scheme to defraud Victim 4 and Victim 5.

120.    On March 25, 2022, the mother of basketball player ▮▮▮▮▮▮▮ made a report to the FBI alleging someone named ▮▮▮▮▮▮▮ attempted to secure a loan for her husband. This matched a scheme that another of WEBER's victims, ▮▮▮▮▮▮▮, reported weeks later.

121.    On June 8, 2022, ▮▮▮▮▮▮ (previously mentioned in JPSO's interview of WEBER in the ▮▮▮▮ scheme, described above in paragraphs 80-81), told the FBI that he was defrauded by someone posing as ▮▮▮▮▮▮▮ parents needing to borrow money. Ultimately, ▮▮▮▮ claimed he was scammed out of $100,000.

122.    ▮▮▮▮▮ alleged he met a "mule" of ▮▮▮▮▮▮▮, named ▮▮▮▮▮▮▮, in person in ▮▮▮▮▮▮, Florida at ▮▮▮▮▮'s home. ▮▮▮▮▮ handed ▮▮▮▮▮▮▮ $17,500 in cash. A review of financial records by FBI revealed that, between March 18 and May 9, 2022, ▮▮▮▮▮ sent ▮▮▮▮▮▮ six transfers, totaling $30,050, via Zelle to ▮▮▮▮▮▮▮

account. Funds from these transfers were later transferred to accounts owned by ▮▮▮, a co-conspirator of WEBER.

### III.    PROBABLE CAUSE

123.    Based on the foregoing, I respectfully submit there is probable cause to believe that Albert Paul WEBER Jr. violated **18 U.S.C § 875 (interstate transmission of threat), 18 U.S.C § 1028A (aggravated identity theft), 18 U.S.C § 1343 (wire fraud), 18 U.S.C § 1349 (conspiracy to commit wire fraud), 18 U.S.C § 1512(a)(2) (threatening a witness), 18 U.S.C § 1956(a)(1)(B)(1) (money laundering concealment),** and **18 U.S.C § 1956(h) (money laundering conspiracy).**

Respectfully submitted,

_____
/s/Emily Keller
Emily Keller
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on the 26th day of March, 2026.
New Orleans, Louisiana

_____
THE HONORABLE MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF LOUISIANA